UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL BOURRIENNE, individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10-cv-07295 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| JOHN P. CALAMOS, SR., Trustee of the Calamos Convertible Opportunities and Income Fund, *et al.*, | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

**MURRAY, FRANK & SAILER LLP**
Marvin L. Frank
Benjamin D. Bianco
Gregory A. Frank
275 Madison Avenue, Suite 801
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

**LASKY & RIFKIND, LTD.**
Leigh Lasky
Norman Rifkind
350 N. LaSalle Street, Suite 1320
Chicago, IL 60654
Tel: (312) 634-0057
Fax: (312) 634-0059

*Attorneys for Plaintiff*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................................................... 1

I. FACTS ..................................................................................................................... 2

II. STANDARDS ........................................................................................................... 6

III. ARGUMENT ............................................................................................................. 7

    A.    The Claims Asserted in This Action are Direct in Nature. ........................... 7

    B.    Plaintiff's Claims Are Not Based on Misrepresentations Or Omissions and
        Are Therefore Not Precluded by SLUSA. ..................................................... 9

    C.    Defendants Had No Rational Business Purpose for Their Breaches of
        Fiduciary Duty. .............................................................................................. 12

    D.    The Trustee Defendants Are Subject to Default Fiduciary Duties Under
        Delaware Law. ............................................................................................... 13

    E.    The Declaration Forming the Calamos Trust Does Not Insulate the Trustee
        Defendants from Common Law Breach of Fiduciary Duty Liability. ......... 15

    F.    The Trustee Defendants Did Not Act Under A Reasonable Belief Their
        Actions Were in the Best Interests of the Trust. .......................................... 17

    G.    Plaintiff Has Sufficiently Pled that the Calamos Defendants
        Aided and Abetted the Trustee Defendants' Breach of Fiduciary Duty. ..... 19

    H.    Plaintiff Has Sufficiently Pled that the Calamos Defendants Were Unjustly
        Enriched Through Their Wrongful Conduct. ................................................ 21

IV. CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## Rules and Statutes

Delaware Statutory Trust Act, Section 3809 ............................................................................13

Fed R. Civ. P. 15(a) .......................................................................................................................7

Fed. R. Civ. P. 12(b)(6) ..............................................................................................................6, 7

## Cases

*Anderson v. Aon Corp.*,
   No. 06-6241, 2008 WL 4865574 (N.D. Ill. June 16, 2008) ........................................7

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)....................................................................................................6

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................................6

*Bosley v. Baltimore County, Md.*,
   804 F. Supp. 744 (D. Md. 1992)....................................................................................9

*Cargill, Inc. v. JWH Special Circumstance, LLC*,
   959 A.2d 1096 (Del. Ch. 2008) ............................................................13, 14, 15, 17

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1134 (Del. 1994)............................................................................................14

*Crestview Vill. Apartments v. United States HUD*,
   383 F.3d 552 (7th Cir. 2004) ........................................................................................7

*Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*,
   No. 379-N, 2005 WL 1713067 (Del. Ch. July 13, 2005) ............................................7

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*,
   624 A.2d 1199 (Del. 1993) ............................................................................................7

*Emergency Medical Care, Inc. v. Marion Memorial Hosp.*,
   94 F.3d 1059 (7th Cir. 1996) ......................................................................................17

*Erb v. Alliance Capital Management, L.P.*,
   423 F.3d 647 (7th Cir. 2005) ......................................................................................10

*Estate of Howell*,
   No. 117657, 2002 WL 31926604 (Del. Ch. Dec. 20, 2002)........................14, 16, 17

*Fleer Corp. v. Topps Chewing Gum, Inc.,*
   539 A.2d 1060 (Del. 1988)...................................................................................21

*Foster v. DeLuca,*
   545 F.3d 582 (7th Cir. 2008) ...................................................................................7

*Fusion Capital Fund II, LLC v. Ham,*
   614 F.3d 698 (7th Cir. 2010) ...................................................................................7

*Gatz v. Ponsoldt,*
   925 A.2d 1265 (Del. 2007) .....................................................................................19

*In re Abbott Laboratories Derivative Shareholders Litigation,*
   325 F.3d 795 (7th Cir. 2003) ...................................................................................7

*In re Citigroup Inc. Shareholder Derivative Litig.,*
   964 A.2d 106 (Del. Ch. 2009) ...............................................................................13

*In re Fruehauf Trailer Corp. v. Chriss Street,*
   431 B.R. 838 (Bank. C.D. Cal. 2010).............................................................12, 15

*In re Lukens Inc. Shareholders Litig.,*
   757 A.2d 720 (Del. Ch. 1999) ...............................................................................20

*In the Matter of the Estate of Jacob Schulman,*
   568 N.Y.S.2d 660, 165 A.D.2d 499 (1991) ...........................................................15

*Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.,*
   225 F.3d 876 (7th Cir. 2000) .................................................................................17

*Jackson Nat. Life Ins. Co. v. Kennedy,*
   741 A.2d 377 (Del. Ch. 1999) ...............................................................................21

*McNeil v. McNeil,*
   798 A.2d 503 (Del. 2002) ......................................................................................18

*Nagy v. Riblet Products Corp.*
   79 F.3d 572 (7th Cir. 1996) .....................................................................................6

*Stegemeier v. Magness,*
   728 A. 2d 557 (Del. 1999) ................................................................................14, 15

*Swanson v. Citibank, N.A.,*
   No. 10-cv-1122, 2010 WL 2977297 (7th Cir. July 30, 2010) .............................6, 15

*Teachers' Retirement System of Louisiana v. Aidinoff,*
   900 A.2d 654 (Del. Ch. 2006) ...............................................................................20

*Technicorp International II, Inc. v. Johnston,*
   No. 15084, 2000 WL 713750 (Del. Ch. May 31, 2000)...................................12, 13

*Walls v. Peck,*
   No. 497, 1979 WL 26236 (Del. Ch. Oct. 24, 1979) ..............................................14

**<u>Miscellaneous</u>**

George Gleason Bogert,
    THE LAW OF TRUSTS AND TRUSTEES, § 543 (2d ed. 1993)......................................................14

## INTRODUCTION

Defendants[1] in this action are the trustees ("Trustee Defendants") and the investment managers ("Calamos Defendants") of the Calamos Convertible Opportunities and Income Fund (the "Trust"). In addition to issuing common shares, the Trust issued auction market preferred shares ("AMPS") in order to raise investment capital. The AMPS were a form of equity financing, with the interest rate set periodically through a securities auction process.

Due to the collapse of the auction-rate securities market in early-2008, the AMPS' interest rate became fixed at a very low rate, well-below market. Given that the AMPS were perpetual (*i.e.*, not redeemable by the holders), the failure of the auction-rate securities market created a permanent low-cost financing source for the Trust, as well as Plaintiff and members of the Class (the "Trust Beneficiaries").

Defendants subsequently breached their fiduciary duty of loyalty to the Trust Beneficiaries by redeeming the AMPS, an action that injured the Trust Beneficiaries while simultaneously benefitting Defendants, a clear instance of self-dealing under Delaware trust law. Specifically, Defendants replaced the AMPS' equity leverage with more expensive debt financing, costing the Trust Beneficiaries *millions* of dollars in increased fees and borrowing costs while offering *no benefits* to the Trust Beneficiaries.

These actions, however, benefitted Defendants' associated Wall Street banks and broker-dealers that had sold the AMPS to the public by falsely claiming that the AMPS would always be liquid instruments and were now under pressure from authorities and private litigants to repurchase them.

---

[1] Trustees are John P. Calamos, Sr., Weston W. Marsh, Joe F. Hanauer, John E. Neal, William R. Rybak, Stephen B. Timbers, David D. Tripple; and investment managers are Calamos Advisors, LLC and Calamos Asset Management, Inc.

Redeeming the AMPS as an accommodation to the Wall Street banks and broker-dealers was critical to Defendants because each of the Trustee Defendants is either an officer or director in 19 other funds founded or operated by defendant John Calamos and his group of companies. If Defendants did not refund the AMPS, to the detriment of the Trust Beneficiaries, they would have substantial difficulty securing future financing for their other Calamos funds.[2]

Inevitably, in November 2008, after paying a remarkably consistent common share dividend each month for more than sixty consecutive months, the Trust reduced its dividend by over 32% in order to pay for the higher-cost of the replacement debt financing.

## I.     FACTS

The Trust is organized as a closed-end statutory investment trust under Delaware law. Complaint ¶1.[3]  Unlike other Delaware corporations, as an investment trust, its business operations are relatively straight forward—the Trust raised money from the sale of its common shares to Plaintiff and other members of the Class, and the Trust invested the money in order to earn a yield for the Trust Beneficiaries. ¶1.

The Trust is managed by the Trustee Defendants. ¶¶9-15. In addition to their duties to the Trust, each of the Trustee Defendants also serves as a trustee or director for at least 19 other funds sponsored by the Calamos Sponsorship Group. ¶29.[4]  The Trustee Defendants each received (and continue to receive) compensation of over $130,000 per year for their duties in managing the numerous Calamos funds within the Calamos Sponsorship Group. ¶29. In order

---

[2]  Given that the Trust is closed-end and fully leveraged, it does not, and never will, require additional financing.

[3]  Hereafter, all references to (¶_) will refer to the Complaint, filed October 15, 2010, in the Circuit Court of Cook County, Illinois.

[4]  The Calamos Sponsorship Group refers to all closed-end investment entities founded or sponsored by defendant John Calamos or the Calamos Defendants. ¶26.

2

to operate and manage their numerous investment funds, as well as to gain financing for leveraging the assets of those funds, the Calamos Sponsorship Group relies heavily on investment banks and broker-dealers that sell Calamos fund shares to investors. ¶27.

In addition to his duties as a trustee, defendant John Calamos is the Chief Executive Officer and Co-Chief Investment Officer of defendant Calamos Advisors, LLC. Defendant John Calamos is also Chairman, Founder, Chief Executive Officer, President, Portfolio Manager, and Co-Chief Investment Officer of defendant Calamos Asset Management, Inc.[5]

Since its inception through the present, the Trust has consistently employed a business model based on the borrowing of additional capital to serve as investment leverage. ¶2. From June 2002-March 2008, the Trust achieved this leverage through the issuance of AMPS which paid the various AMPS-shareholders a special dividend that was reset periodically through an auction mechanism. ¶¶2, 23. The AMPS provided particular flexibility to the Trust because the AMPS are classified by the SEC as equity for purposes of the Investment Company Act of 1940, allowing for a higher leverage ratio than would be allowed for debt financing. ¶2.

Importantly, the AMPS had no maturity date and the AMPS-holders had no right of redemption. ¶2. Thus, the Trust could never be forced to redeem the AMPS for any reason. ¶2. At all times, the Trust retained the ability to redeem the AMPS at its own election so long as doing so was demonstrably in the best interests of the Trust Beneficiaries (*i.e.*, Plaintiff and other members of the Class). ¶2. At the behest of Defendants, broker-dealers had recommended the AMPS securities to clients as a low-risk, liquid, short-term investment. ¶31.

Although, the AMPS had no maturity date, the auction market provided a means by which AMPS holders could sell (liquidate) their investments. ¶31. In February 2008, however,

---

[5] http://investing.businessweek.com/research/stocks/people/person.asp?personId=3608739&ticker=CLMS:US (last visited on Jan. 13, 2011).

the market for auction-rate securities collapsed as part of a larger, worldwide collapse of such markets. ¶31. Moreover, since February 13, 2008, auction markets for AMPS have regularly failed. ¶33. Such a collapse was specifically contemplated prior to the issuance of the AMPS. Indeed, the AMPS Prospectus specifically stated that: "If an auction fails you may not be able to sell some or all of your shares"; and "[t]he AMPS are not redeemable by the holders of AMPS." ¶34. The terms of the AMPS even provided a formula to calculate a default interest rate in the event the auctions failed. ¶¶3, 24, 34.

The collapse of the AMPS market provided an unusual benefit to the Trust Beneficiaries. As public interest rates were unusually low in 2008, the collapse of the AMPS auction market lead to extremely low borrowing costs (interest) to be paid to the AMPS-holders. ¶¶3, 25(b). Further, the Trust Beneficiaries gained perpetual financing, which is particularly valuable in the currently unstable financial markets. ¶25(a). The failure of the AMPS auction market had no materially adverse affects on the rights of the Trust Beneficiaries. ¶34.

Yet, as the market for AMPS became illiquid, numerous AMPS holders and state attorneys general sought to hold the investment banks and brokers who recommended investing in AMPS responsible for purported misrepresentations regarding the AMPS' liquidity. ¶35. In numerous instances, broker-dealers decided to purchase back, from their clients, various auction-rate securities that were marketed as liquid investments. ¶35. At *no time* was the Trust under threat of lawsuit as the Trust Prospectus had specifically contemplated the failure of the auction markets. ¶¶3, 24, 34.

In order to protect their ability to finance new and existing funds via the Calamos Sponsorship Group, however, Defendants decided to redeem the AMPS at a tremendous cost to the Trust Beneficiaries. ¶35. Ignoring their duty of loyalty to the Trust Beneficiaries,

Defendants redeemed the AMPS because maintaining a good relationship with investment banks and broker-dealers is critical to the success of the other Calamos Sponsorship Group funds. ¶38. Moreover, Defendants furthered their own pecuniary interests, and those of their associated investment banks and broker-dealers, by relieving the various investment banks and broker-dealers of their potential liability for selling, and then repurchasing, the AMPS. ¶¶35, 38. Indeed, in 2009, Defendants callously bragged that their actions had maintained, and even grew, their relationships with these associated financial entities. ¶38.

Accordingly, between June 2, 2008 and June 26, 2008, and again between August 13, 2009 and August 24, 2009, Defendants repurchased the AMPS, ¶¶36-37, and injured Plaintiff and the other members of the Class by securing substantially more expensive financing at higher interest costs, and unnecessary refinancing fees, ¶41, 43. For the year ending October 31, 2009 alone, the Fund paid fees on the Replacement Borrowing[6] that totaled almost $7 million, as compared to only $500,000 spent on auction-related fees in the year prior to the redemption of the AMPS. ¶43. By paying the full par value of $25,000 for the AMPS shares, Defendants also vastly overpaid for the securities as they had dropped significantly in value once they became illiquid. ¶40.

Plaintiff and the other members of the Class experienced a direct injury as a result of Defendants' conduct due to the more than 32% drop in their common share dividends. The drastic reduction of the dividends corresponds directly with the higher cost of the Replacement Borrowing. Indeed, for the five consecutive years leading up to the Replacement Borrowing, the Trust consistently issued a monthly dividend to the Trust Beneficiaries of $0.14-$0.15 per share. Suddenly, in November 2008, shortly after the refinancing and its commensurate increase in

---

[6] "Replacement Borrowing" generally refers to the Fund's debt financing that was used to redeem and replace the AMPS.

5

costs, the Trust dramatically decreased its dividend to $0.095, a decrease of over 32%. ¶51(a). The Trust's common share dividend has remained at $0.095 ever since.

## II.   STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007).   The plausibility standard is "not akin to a probability requirement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   "'Plausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.,* No. 10-cv-1122, 2010 WL 2977297, at *3 (7th Cir. July 30, 2010).   Indeed, "a well-pleaded complaint may proceed even if it strikes a saavy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Twombly*, 550 U.S. 556.

With respect to Plaintiff's substantive claims, this action is governed by Delaware state law.[7]   In *Nagy v. Riblet Products Corp.*79 F.3d 572, 576 (7th Cir. 1996), the Seventh Circuit set forth the appropriate choice-of law analysis with respect to corporate malfeasance.   In *Nagy*, the plaintiffs, minority shareholders in Riblet Products Corp., brought direct breach of fiduciary duty claims in the Northern District of Indiana against the majority shareholders of Riblet, a Delaware Corporation.   Applying the "internal affairs doctrine," the Seventh Circuit held that where the state in which suit is brought endorses the internal affairs doctrine, the law governing the action should be based on the state of incorporation. *Id.* ("Riblet's principal place of business is in Indiana, but it is incorporated in Delaware—and the liability of corporate investors and directors for intra-corporate affairs almost invariably depends on the law of the place of incorporation.").

---

[7]   Defendants frequently, and erroneously, site to Illinois law regarding substantive legal issues. *See, e.g.,* Calamos Supp. Br. at 2-7.

6

As Illinois law recognizes the internal affairs doctrine, Delaware law must apply to this action. *See Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 699 (7th Cir. 2010) ("Because Millennium is incorporated in Nevada, that state's law determines whether its investors are liable for its debts. (This is an aspect of the internal-affairs doctrine, a choice-of-law rule to which Illinois adheres).").

Under Delaware law, "[w]here the complaint sufficiently alleges a breach of fiduciary duties based on a failure of the directors to act in good faith, bad faith actions present a question of fact that cannot be determined at the pleading stage." *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 811 (7th Cir. 2003) (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1209-10 (Del. 1993)).

## III.   ARGUMENT

### A.   The Claims Asserted in This Action Are Direct in Nature.

Plaintiff in this action asserts direct claims against Defendants. Under Delaware law, a cause of action concerning a discriminatory allocation of resources favoring one group of stockholders over another is always direct in nature. *See Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, No. 379-N, 2005 WL 1713067, at *8 n. 41 (Del. Ch. July 13, 2005) ("Causes of action . . . for discrimination against specific stockholders have often been found to be direct and not derivative in nature."). [8]

---

[8]   Should the court find that Plaintiff's claims are in fact derivative, Plaintiff respectfully requests leave to re-plead in accordance with the liberal pleading requirements of Fed R. Civ. P. 15(a). *See Foster v. DeLuca*, 545 F.3d 582, 583-84 (7th Cir. 2008) ("For purposes of Rule 15(a), a motion to dismiss does not constitute a responsive pleading . . . thus, 'an order dismissing the original complaint normally does not eliminate the plaintiff's right to amend once as a matter of right.'") (quoting *Crestview Vill. Apartments v. United States HUD*, 383 F.3d 552, 557 (7th Cir. 2004); *see also Anderson v. Aon Corp.*, No. 06-6241, 2008 WL 4865574, at *6 (N.D. Ill. June 16, 2008) (granting leave to amend after Rule 12(b)(6) dismissal based on determination that claims were properly derivative and not direct, as pled).

## 1.    Plaintiff and the Class Have Suffered Direct Monetary Injury.

Defendants argue that Plaintiff's claims are derivative because Plaintiff cannot establish damages. Defendants are wrong. As set forth in the attached dividend chart,[9] beginning in June 2003, the Trust paid a consistent monthly dividend of either 14 cents or 15 per share to its common shareholders. The Trust continued to pay this fixed dividend for 65 consecutive months. In November 2008, however, shortly after Defendants initiated the higher-cost Replacement Borrowing, the Fund's monthly dividend plummeted by 32%, to less than 10 cents per share ($.095). The Trust has continued to pay the 9 ½ cent dividend through the present.

Given the Trust's long established and consistent dividend history, it is clear that the perpetually higher cost of the Replacement Borrowing is at least partially responsible for the significant diminution of the Fund's common share dividend. Moreover, the higher cost of the Replacement Borrowing necessarily diminished the Trust's profits (and resulting dividends) because profits, in the context of a trust, are defined simply as revenue minus costs. Indeed, the Trusts' dividend returns to the Trust Beneficiaries were so consistent that Defendants bragged about them in their shareholder reports.[10]

Defendants' argument that "there is no guarantee [] Plaintiff would have received any dividends at all" going forward is absurd. (Calamos Supp. Br. at 6.) As Defendants' themselves admit, the fund at issue is a "total return" investment trust and, as such, is required to distribute profits as monthly dividends. (*Id.* at 6-7 n.6).

---

[9]  Plaintiff has included the Trust's publically available dividend information from June 2003 through the present, along with a corresponding chart (attached hereto as Exhibit 1). In considering a motion to dismiss, a court may take judicial notice of publically available information. *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

[10]  *See, e.g.*, Certified Shareholder Report, filed with the SEC on form N-CSR on Dec. 28, 2007 ("Throughout the period, the Fund provided shareholders with a steady income stream, with monthly distributions of $0.1500 per share. The Fund has provided monthly distributions of at least this level since June 2003.").

In addition, Defendants' citation to *Bosley v. Baltimore County, Md.*, 804 F. Supp. 744 (D. Md. 1992) as support for its damages argument in misguided. In *Bosley*, the plaintiff brought due process and equal protection claims against the Baltimore County Attorney. The plaintiff's allegations surrounded the Attorney's recommendation that Conclusion (a Maryland corporation in which plaintiff owned a property interest) not be accorded a hearing for inclusion in a special preservation district for farm property owned by Conclusion. *Id.* at 747-48. The plaintiff argued that if the special preservation district was created, it would benefit Conclusion and may lead to, *inter alia*, dividends derived therefrom. *Id.* at 748.

In rejecting the plaintiff's claims, the court's analysis focused entirely on the uncertainty of Conclusion's property interest in the special preservation district under the Maryland Agricultural Code. *Id.* ("Because Conclusion has no constitutionally cognizable property interest, there can be no due process violation."). The court's only reference to dividends appears in *dicta* amongst a parade of uncertainties including that there was no guarantee the preservation district would be created, and even if created, that the preservation district would necessarily lead to economic benefits to Conclusion. *Id.* at 750-51.

Here, however, the Trust is required to distribute profits as monthly dividends, and the Replacement Borrowing has, and will continue to, cost the Trust more than did the AMPS. Consequently, the amount of the Trust's dividend has been, and will continue to be, diminished. Therefore, as common shareholders of the Fund both before and after the Replacement Borrowing, Plaintiff and the Class have been damaged by the reduction of dividends caused directly by the Replacement Borrowing.

**B.      Plaintiff's Claims Are Not Based on Misrepresentations Or Omissions and Are Therefore Not Precluded by SLUSA.**

Defendants' preclusion argument is founded upon a gross misreading of the Complaint.

9

The Securities Litigation Uniform Standards Act ("SLUSA") preempts a claim only if it: (i) is brought as a covered class action; (ii) is based on state law; (iii) alleges that the defendant misrepresented or omitted a material fact; *and* (iv) asserts that defendant did so in connection with the purchase or sale of a covered security. *Erb v. Alliance Capital Management, L.P.*, 423 F.3d 647, 651 (7th Cir. 2005).

Nowhere in the Complaint does Plaintiff allege that any statements attributed to any of the Defendants were false. The facts of this case are straight-forward. As of April 2008, the Fund had approximately $384 million, or 1/3 of the value of the Trust, in AMPS outstanding at very favorable interest rates. The AMPS' interest rates were very low due to the collapse of the auction-rate securities market. Given that AMPS could not be unilaterally redeemed *by the holders*, the collapse of the auction-rate securities market created an indefinite, low-cost financing windfall for the Fund. In June 2008, and again in August 2009, however, the Trustee Defendants decided to redeem (without logical business justification) the Fund's AMPS in exchange for higher-cost, less-advantageous debt financing. Consequently, the Fund was forced to pay substantial transaction costs to secure the unnecessary Replacement Borrowing and to pay perpetually higher interest rates on the Replacement Borrowing, rates which far exceeded those of the redeemed AMPS.

Moreover, this action concerns the Trustee Defendants breach of their duty of loyalty (and the Calamos Defendants aiding and abetting the breach) to the Trust Beneficiaries, by improperly redeeming the AMPS for less advantageous financing. The AMPS redemption had no rational business purpose other than to benefit Defendants and their mutual interests in the Calamos Sponsorship Group.

Importantly, this case does NOT involve a misrepresentation or omission of *any* kind.

Defendants attempt to re-write the Complaint must be ignored. For example, Defendants misstate Plaintiff's allegations concerning whether the AMPS were redeemable. (Joint Br. at 8) ("The premise of the Complaint is that the Defendants misled common shareholders by representing that the financing provided by AMPS was 'perpetual' . . . but then redeemed the AMPS and substituted assuredly less favorable financing in its place . . . ."). Plaintiff has always been clear on this point—the AMPS were redeemable at the election of the Trust, but not at the election of the AMPS-holders. *Compare* ¶34 ("The Fund was not obligated to redeem AMPS"), *with* ¶34 ("The AMPS are not redeemable by the holders of AMPS."), a mere three lines apart.[11] Nowhere does the Complaint allege that the Trustee Defendants could not or would not redeem the AMPS. Indeed, the crux of this action is that they should not, in accordance with their fiduciary duties, have redeemed the AMPS. Moreover, by redeeming the AMPS for the benefit of the AMPS holders and for themselves, Defendants breached their duty of loyalty to the common shareholders of the Trust.

Defendants also claim to identify, through their joint brief and attached notice of removal, ten paragraphs in the Complaint that purportedly contain allegations of "misrepresentations or omissions of material fact." (Joint Br. at 7; Notice of Removal at 4-6.) The collection of references are not misrepresentations and do nothing to support Defendants' assertion that this action is one cloaked in fraud.[12]

---

[11] The clarity of the language in ¶34, and the fact that these statements appear in adjacent sentences in the same paragraph, highlights Defendants' bad faith interpretation of Plaintiffs' complaint.

[12] Specifically, paragraph 23 describes the Fund's objective as seeking to "provide total return through a combination of capital appreciation and current income"; paragraph 25 describes the benefits of the Fund's AMPS equity financing; paragraphs 36-38 describe how the Fund improperly redeemed the AMPS to the detriment of the common shareholders; paragraphs 42, 44, and 47-48 describe how the terms of the Replacement Borrowing are less advantageous for the common shareholders; and paragraph 51 describes how Plaintiff and the Class were damaged

11

The Complaint does not assert that a single statement contained in any of Defendants' referenced paragraphs is untrue. Indeed, the referenced paragraphs are entirely factual in nature and illustrate how the terms of the AMPS were far more advantageous than those of the Replacement Borrowing. In sum, the Complaint challenges the conduct, not any statements, of the Trustee Defendants concerning the redemption of the AMPS. As such, Plaintiff's claims are not subject to SLUSA preclusion.

### C.   Defendants Had No Rational Business Purpose for Their Breaches of Fiduciary Duty.

The Trust Beneficiaries gained absolutely no benefit, and in fact incurred a detriment, from Defendants' redemption of the AMPS. Indeed, nowhere do Defendants even suggest that the AMPS redemption benefited the Trust or its common shareholders in any appreciable way.

Therefore, the Trustee Defendants' argument that they are somehow shielded by the business judgment rule is unsupported by Delaware law.[13] *Technicorp International II, Inc. v. Johnston* is particularly instructive.[14] In *Technicorp*, at issue was whether an enterprise incurring additional costs in order to obtain a line of credit was a business judgment issue. The court held that because the funds from the line of credit were ultimately used in a manner that was self-serving to the trustees for purposes other than those that benefitted the trust, the trustees were liable for the costs associated with securing the additional funds. *Id.* The *Technicorp* trustees argued that borrowing funds for corporate use was a valid exercise of business judgment. In

---

by Defendants' conduct.

[13]  Under Delaware law trustees should not be accorded the deference of the business judgment rule because of the higher standards of care for trustees under trust law than over directors under corporate law. *In re Fruehauf Trailer Corp. v. Chriss Street,* 431 B.R. 838, 850 (Bank. C.D. Cal. 2010) ("This Court rejects Defendant's position that the 'business judgment rule' applies to a trust.").

[14]  No. 15084, 2000 WL 713750, at *45 (Del. Ch. May 31, 2000).

rejecting this argument, however, the court looked to see how the funds were actually *spent*, and whether those expenditures directly benefited the trust or merely provided benefits to the trustees. Finding that the true benefits of the expenditures were to the trustees, and not the trust or its beneficiaries, the court found no such valid business purpose. *Id.*

The case at bar is similar to *Technicorp*. Here, the unnecessary expenditure of millions of dollars in borrowing costs without any appreciable benefit to Plaintiff and the Class, is not a legitimate use of business judgment.[15] Indeed, the true beneficiaries of Defendants' very expensive and unwarranted conduct were Defendants themselves, as they were able to maintain and improve their relationships with their associated Wall Street banks and broker-dealers, thus benefitting Defendants' other present and future funds.[16]

### D. The Trustee Defendants Are Subject to Default Fiduciary Duties Under Delaware Law.

All trusts founded under Delaware law are subject to default common law and statutory fiduciary duties. *Cargill, Inc. v. JWH Special Circumstance, LLC*, 959 A.2d 1096, 1110-11 (Del. Ch. 2008) ("The [Delaware Statutory Trust Act] does not completely preempt either the field of trust law or the application of traditional default fiduciary duties."). Section 3809 of the Delaware Statutory Trust Act states as follows:

> Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts . . . .

---

[15] To the extent the Court finds that this action is properly derivative in nature, Plaintiff, contrary to Defendants' assertion, can establish demand futility. To establish futility of demand, a plaintiff must plead particularized facts creating a reasonable doubt that "(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). Given that Defendants had no legitimate, rational basis for redeeming the AMPS, and that each of the Trustee Defendants had a specific interest in the redemption, Plaintiff can satisfy either prong of the demand futility requirement.

[16] As discussed (*supra*), the Trust is closed-end and fully leveraged, therefore, neither the Trust Beneficiaries nor the Trust would gain anything from access to additional financing.

12 Del. C. Sec. 3809.

Contrary to Defendants' grossly inaccurate characterizations of the trust law they cite (*see* Trustees Supp. Br. at 7-8), Delaware law applies a *higher* standard of care to trustees than to corporate directors. *Cargill*, 959 A.2d at 1113. The heightened standard is a result of the differing duties that a trustee, versus a corporate director, is charged with carrying forward:

> The role of the trustee is prudently to manage assets placed in trust, within the parameters set down in the trust instrument. The classic trusteeship is not essentially a risk taking enterprise, but a caretaking one. Hence, while trustees may be surcharged for negligence, a corporate director is only considered to have breached his duty of care in instances of gross negligence.

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. 1994).

Accordingly, under Delaware law trustees are held to a stricter fiduciary duty of loyalty than are their corporate counterparts. *Stegemeier v. Magness,* 728 A. 2d 557, 562 (Del. 1999); *Cargill,* 959 A.2d at 1113. Specifically, under Delaware trust law, it is not necessary for a trustee to stand on both sides of a transaction for such a transaction to be considered self-dealing. *Stegemeier*, 728 A.2d at 564. In the context of a trust: "self-dealing occurs when the fiduciary has a "personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection." *Id.* (emphasis added).

In addition, a trustee's duty of loyalty extends not only to the trust, but also directly to the trust beneficiaries. *See Estate of Howell*, No. 117657, 2002 WL 31926604 (Del. Ch. Dec. 20, 2002) ("A trustee is also under a duty to deal fairly with the beneficiaries and not to place his personal interests . . . ahead of the interests of the Trust and its other beneficiaries.") (citing *Walls v. Peck*, No. 497, 1979 WL 26236, at *4 (Del. Ch. Oct. 24, 1979) and George Gleason Bogert, THE LAW OF TRUSTS AND TRUSTEES, § 543 (2d ed. 1993) ("[T]he loyalty rule may be simply stated: A trustee is under a duty to the beneficiary of the trust to administer the trust

14

solely in the interest of the beneficiary. The trustee must exclude all self-interest, as well as the interest of a third party.")).

In establishing a breach of a trustee's duty of loyalty under Delaware law, the burden of persuasion to justify a suspect transaction by an interested trustee rests with the trustee, not the beneficiary. *Stegemeier*, 728 A. 2d at 563. A trustee must satisfy this burden by a preponderance of the evidence. *See In re Fruehauf*, 431 B.R. at 859 (applying Delaware law); *see also In the Matter of the Estate of Jacob Schulman*, 568 N.Y.S.2d 660, 165 A.D.2d 499 (1991). On this motion to dismiss, where all facts alleged by Plaintiff are assumed to be true, it is clear that Defendants cannot satisfy their burden. *Swanson*, 2010 WL 2977297, at *3.

### E.    The Declaration Forming the Calamos Trust Does Not Insulate the Trustee Defendants from Common Law Breach of Fiduciary Duty Liability.

Defendants argue, and it is true that the Delaware Statutory Trust Act provides the authority to the founders of a trust to limit the fiduciary duties that the trustees may owe to a trust. *Cargill*, 959 A.2d at 1112. Had the founders of the Trust intended to eliminate the common law fiduciary duties owed by the Trustees to the Trust, they could have done so. Here, however, the founders of the Trust chose NOT to expressly eliminate Defendants' default fiduciary duties. Consequently, the Trustee Defendants, in their Brief, attempt to manufacture a limitation on liability through the juxtaposition of different sections of the Declaration, glued together with unsupportable, conclusory legal argument.

Indeed, the passage quoted by the Trustee Defendants is merely a choice of law clause indicating that in accordance with the provisions of the Delaware Trust Act, where terms of authority and liability differ from the default common law and statutory duties of a Delaware trust, the charter should be given preference. Trustees Supp. Br. at 6; *see also* 12 Del. C. Sec. 3806(c) ("trustee's or beneficial owner's or other person's duties may be expanded or restricted

15

or eliminated by provisions in the governing instrument").

Moreover, upon examination of the *full* text of the Declaration which includes substantial language discussing the expansive powers to be accorded to the Trustees, the Trust instrument does not limit the Trustee Defendants' liability:[17]

> Section 9. <u>Applicable Law</u>. This Declaration and the Trust created hereunder are governed by and construed and administered according to the Delaware Act and the applicable laws of the State of Delaware; provided, however, that there shall not be applicable to the Trust, the Trustees or this Declaration of Trust . . .(vii) the establishment of fiduciary or other standards of responsibilities or limitations on the acts or powers of trustees, which are inconsistent with the limitations of liabilities or authorities and powers of the Trustees set forth or referenced in this Declaration. *The Trust shall be of the type commonly called a Delaware business trust, and, without limiting the provisions hereof, the Trust may exercise all powers which are ordinarily exercised by such a trust under Delaware law. The Trust specifically reserves the right to exercise any of the powers or privileges afforded to trusts or actions that may be engaged in by trusts under the Delaware Act, and the absence of a specific reference herein to any such power, privilege or action shall not imply that the Trust may not exercise such power or privilege or take such actions.*

(Emphasis added.)

In *Estate of Howell*,[18] the Delaware Chancery Court specifically rejected an argument similar to the one Defendants advance here. In *Howell*, the defendant trustees argued that, although the trust agreement did not expressly state that the trustees should be absolved of fiduciary duties under common law, such an exculpation should be implied as any such fiduciary duties would necessarily conflict with the trustees' stated power to dispose of assets under the

---

[17] As the quote appears under a choice-of-law provision, the most logical interpretation of the phrase "limitations of liabilities or authorities and powers of the Trustees set forth or referenced in this Declaration" is that the phrase "limitations of" is meant to modify both the word "liabilities" and the phrase "authorities and powers." Such an interpretation would lead to the far more reasonable result that the Declaration should be given the final word in specific limitations of liabilities, authorities, and powers (as is lawful under the Trust Act), while traditional common law duties remain unchanged absent such express limitation.

[18] No. 117657, 2002 WL 31926604, at *2-3 (Del. Ch. Dec. 20, 2002).

16

trust agreement. *Id.* at 3. In rejecting this contention, the Delaware Chancery Court held:

> Although the authority to value assets and the authority to distribute assets are essential for the fiduciary to carry out the decedent's intent, the mere grant of such authority, by itself, cannot be the basis for reducing a fiduciary's obligation to the beneficiaries.

*Id.*

The Trustee Defendants in this action make the identical argument to that rejected by the *Howell* court—namely that a trust agreement that fails to expressly eliminate the trustees' common law fiduciary duties should be interpreted to have done so as such duties would be "inconsistent" with their enumerated powers.[19]

Plaintiff's interpretation also comports with the contract interpretation guidance provided by the Seventh Circuit in situations such as this one. *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 880 (7th Cir. 2000); *Emergency Medical Care, Inc. v. Marion Memorial Hosp.*, 94 F.3d 1059, 1061-62 (7th Cir. 1996). In both *Health Care* and *Marion Memorial Hosp.*, the court was faced with ambiguous contract language that could either be given a plain, narrow interpretation or a broader interpretation. In lieu of the parties' failure to have expressly set forth the broader meaning, in both instances the Seventh Circuit dictated that the more narrow meaning be applied. *Id.*[20]

### F. The Trustee Defendants Did Not Act Under A Reasonable Belief Their Actions Were in the Best Interests of the Trust.

Regardless of which standard of liability is applied to Defendants' conduct, Defendants

---

[19]  Moreover, it is clear that the enumerated powers of a Trustee are so broad, as they include even the most basic of trust functions, that the interpretation Defendants' seek would functionally eliminate any common law fiduciary duties owed to the Trust Beneficiaries.

[20]  Although it may have been Defendants' right to expressly disclaim such duties, it is an entirely different matter for Defendants' to fail to do so and then to ask this Court to do so for them. *See Cargill*, 959 A.2d at 1115-16 (refusing to interpret trust agreement to eliminate common law fiduciary duties where the agreement failed to do so expressly).

are liable because the AMPS redemption was manifestly unreasonable and could not have been in the interests of the Trust Beneficiaries. Moreover, Plaintiff has sufficiently pled allegations sufficient to meet the heightened liability standard purportedly set forth in the Declaration. The operative section of the Declaration starts off with the following pre-condition: "Provided they have exercised reasonable care and have acted under the *reasonable belief that their actions are in the best interest of the Trust* . . . the Trustees . . . shall not be responsible for any act . . . [except] liability . . . to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence." (Declaration, Art. IV, Sec. 2) (emphasis added).[21] Plaintiff has properly pled that the Trustee Defendants were not acting in the best interest of the Trust Beneficiaries, and in breaching their duty of loyalty by redeeming the AMPS, they engaged in willful misfeasance and bad faith.

The present action is about dollars and cents. Plaintiff has alleged that Defendants' decision to replace the Trusts' low-cost equity financing (through the AMPS) with substantially more expensive debt financing cost Plaintiff and the Class millions of dollars in unnecessary transaction costs and increased financing expenses. ¶¶41, 43, 51(a), (c). As money is fungible, the Replacement Borrowing is in no way qualitatively better than the AMPS financing. The Replacement Borrowing offers no tangible benefit to the Trust, and serves only the financial interests of Defendants. Moreover, as the Trustee Defendants effectively concede, the collapse of the auction-rate securities market provided the Trust with perpetual financing at very low cost. Trustees Supp. Br. at 8. The Trust is a closed-end Fund at maximum leverage, therefore, absent Defendants' wrongful conduct in redeeming the AMPS, the Trust would never have had to refinance and would have enjoyed perpetually low financing. ¶¶3, 25(b).

---

[21] Under Delaware Law, a governing trust cannot raise the evidentiary standard for a trustee's liability above that of gross negligence. *McNeil v. McNeil*, 798 A.2d 503 (Del. 2002). As described, hereunder Plaintiff has pled facts that give rise to a claim of gross negligence.

Considering that the purpose of the Trust is to "provide *total return*, through a combination of capital appreciation and current income" (emphasis added), the unnecessary expenditure of millions of dollars of Trust money has not, and cannot, be reasonably justified by Defendants.

### G. Plaintiff Has Sufficiently Pled that the Calamos Defendants Aided and Abetted the Trustee Defendants' Breach of Fiduciary Duty.

In stating a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must allege: (i) a fiduciary relationship; (ii) a breach of that relationship; (iii) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty; and (iv) damages proximately caused by the breach. *Gatz v. Ponsoldt*, 925 A.2d 1265, 1275 (Del. 2007). Here, Plaintiff has sufficiently pled each of these elements as a matter of law.

#### 1. Fiduciary Relationship and Breach of that Relationship by the Trustee Defendants.

As set forth in sections III.C. and III.F. (*supra*), Plaintiff has established a fiduciary relationship between the Trustee Defendants and the Class and a breach of that fiduciary relationship through the Trustee Defendants' conduct alleged herein.

#### 2. The Calamos Defendants Knowingly Participated in the Breach.

The Calamos Defendants have been, and continue to be, the Fund's investment advisors since the Fund's inception in 2002. ¶¶1, 18-19. As such, the Calamos Defendants are intimately aware, and privy to, the Fund's trading activity and financing.

Indeed, as the Complaint makes clear, the Calamos Defendants participated in the following transactions that form the basis of the Trustee Defendants' breach of their fiduciary duty:

19

- [B]etween June 2, 2008 and June 26, 2008, . . . caused the Fund to redeem approximately 72.9% of all outstanding AMPS at their issue price of $25,000 per share, by means of a refinancing whose terms were less advantageous for the Fund's common shareholders than the terms of the AMPS. ¶36.

- [B]etween August 13, 2009 and August 24, 2009, . . . caused the Fund to redeem the remaining AMPS, again at their issue price of $25,000 per share, and again replaced the redeemed AMPS with financing terms that were less advantageous for the Fund's common shareholders. ¶37.

The Calamos Defendants were also instrumental in securing the Replacement Borrowing that allowed the AMPS to be redeemed, with the Calamos Defendants receiving "substantial fees from the Fund in connection with the Replacement Borrowing." ¶68.[22]

In addition, at all relevant times, Trustee Defendant John Calamos held, and still holds, numerous executive offices with each of the Calamos Defendants.[23] Given that the Calamos Defendants are "fairly charged with the knowledge and conduct" of Trustee Defendant John Calamos, there is no question that the Calamos Defendants *knowingly participated* in John Calamos and the other Trustee Defendants' breach of their fiduciary duty alleged herein. *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654, 672 (Del. Ch. 2006).

### 3. Plaintiff Suffered Damages Through the Calamos Defendants' Conduct.

As set forth in Section III.A.1. (*supra*), Plaintiff and the Class have been damaged by the loss of dividends caused directly by the Replacement Borrowing.

---

[22] With respect to aiding and abetting, at the motion to dismiss stage, knowing participation need not be pleaded with particularity and can be reasonably inferred from other facts alleged in the complaint. *In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 734-35 (Del. Ch. 1999).

[23] Defendant John Calamos is the Chief Executive Officer and Co-Chief Investment Officer with Defendant Calamos Advisors, LLC, and defendant John Calamos is Chairman, Founder, Chief Executive Officer, President, Portfolio Manager, and Co-Chief Investment Officer with Defendant Calamos Asset Management, Inc. *See* http://investing.businessweek.com/research/stocks/people/person.asp?personId=3608739&ticker=CLMS:US (last visited on Jan. 13, 2011).

**H.    Plaintiff Has Sufficiently Pled that the Calamos Defendants Were Unjustly Enriched Through Their Wrongful Conduct.**

Unjust enrichment occurs when a party wrongfully retains "a benefit to the loss of another," or a party retains "money or property of another" in violation of the "fundamental principles of justice or equity or good conscience." *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (*citing Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988). Under Delaware law, the substantive elements of unjust enrichment are: (i) an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and impoverishment; and (iv) the absence of justification. *Jackson*, 741 A.2d, at 393. Here, Plaintiff has sufficiently pled each of these elements as a matter of law.

**1.    The Calamos Defendants Have Been Enriched Through Their Wrongful Conduct.**

The Calamos Defendants have been enriched through fees collected directly from the Trust and through fees collected from numerous other funds within the Calamos Sponsorship Group. As set forth in the Complaint, the Calamos Defendants aided the Trustee Defendants in securing the Replacement Borrowing and "received substantial fees" in connection therewith. ¶68.

**2.    Plaintiff and the Class Have Been Impoverished by the Calamos Defendants' Conduct.**

As set forth in section III.A.1. (*supra*), by redeeming the AMPS and securing the less advantageous, higher-cost Replacement Financing, Plaintiff and the Class were impoverished through the diminution of their monthly common dividends.

**3.    The Calamos Defendants' Enrichment is Directly Related to Plaintiff and the Class's Impoverishment.**

As set forth in the Complaint, the Calamos Defendants aided the Trustee Defendants in securing the completely unnecessary Replacement Borrowing and "received

21

substantial fees" in connection therewith. ¶68. The Calamos Defendants' realization of these illegitimate "substantial fees" was, in part, directly responsible for the diminution of Plaintiff and the Class's monthly common dividend.

### 4. The Calamos Defendants' Conduct is Not Reasonably Justified.

As set forth in sections III.C. and III.F. (*supra*), there is no rational justification, other than self-dealing, for Defendants' decision to redeem the AMPS and secure the less advantageous, higher-cost Replacement Borrowing. Therefore, Plaintiff has established that the Calamos Defendants have been unjustly enriched by their wrongful conduct.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that Defendants' joint motion to dismiss be denied in its entirety.

Dated: January 18, 2011

**MURRAY, FRANK & SAILER LLP**

By: __/s/ Marvin L. Frank_____
      Marvin L. Frank
Benjamin D. Bianco
Gregory A. Frank
275 Madison Avenue, Suite 801
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

**LASKY & RIFKIND, LTD.**
Leigh Lasky
Norman Rifkind
350 N. LaSalle Street, Suite 1320
Chicago, IL 60654
Tel: (312) 634-0057
Fax: (312) 634-0059

*Attorneys for Plaintiff*

## DECLARATION OF SERVICE

I am admitted to this District. I hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 18th day of January, 2011, I served a true and correct copy of the foregoing document upon counsel for all parties by causing a true and correct copy thereof to be filed with the Court, via the Northern District of Illinois' Electronic Case Filing (ECF) system.


  /s/  Marvin L. Frank__
Marvin L. Frank